## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In Re | ) | **JUDGE RICHARD L. SPEER** |
| | ) | |
| David and Cindy Perry | ) | Case No. 10-3096 |
| | ) | |
| Debtor(s) | ) | (Related Case: 10-31078) |
| | ) | |
| The Farmers & Merchants State Bank | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| David and Cindy Perry | ) | |
| | ) | |
| Defendant(s) | ) | |

### MEMORANDUM OPINION AND DECISION

This cause comes before the Court after a Trial on the Plaintiff's Complaint to Determine Dischargeability. The Plaintiff's Complaint is brought pursuant to the statutory exception to dischargeability set forth in 11 U.S.C. § 523(a)(2)(A) which generally excepts from discharge any debt incurred by a debtor's fraud. At the Trial, the Parties were each given the opportunity to present evidence and make any arguments that they wished the Court to consider in reaching its decision. At the conclusion of the Trial, this Court deferred ruling on the matter so as to afford the opportunity to thoroughly review the evidence presented, the arguments of the Parties, as well as the entire record in this case. The Court has now had this opportunity and, for the reasons set forth herein, finds the Plaintiff's Complaint has Merit.

## FACTS

The Plaintiff in this matter, The Farmers & Merchants State Bank, is a national banking association. The Defendants in this matter, David and Cindy Perry, are husband and wife. They are before this Court, having filed on February 26, 2010, a petition for relief under Chapter 7 of the United States Bankruptcy Code. The instant adversary proceeding arises from a relationship each of the Parties maintained, not with the other, but rather with a third party: A&A Cattle.

A&A Cattle operated a cattle brokering business, and had two principals: (1) Robert Allen; and (2) Ralph Allen. The Defendants' relationship to A&A Cattle is first that of kinship to its principals. In particular, the Defendant, David Perry, is Robert Allen's son-in-law, and Ralph Allen's brother-in-law. The Defendant, Cindy Perry Robert, is Robert Allen's daughter and Ralph Allen's sister.

In addition to their familial ties with A&A Cattle, the Defendants also dealt with the family business on a professional level. First, up until the year 2002, the Defendant, David Perry, worked as a cattle broker for A&A Cattle, an occupational field which he still occupies today as an employee with Great Lakes Cattle Marketing, a former competitor of A&A Cattle. Second, the Defendants were also the recipients of a number of transfers made by A&A Cattle.

Between July 2, 2007 and October 16, 2007, A&A Cattle issued 26 checks to the Defendant, Cindy Perry, for the sum of $21,839.72. Also, between September 10, 2007 and December 28, 2007, A&A Cattle issued 13 checks to the Defendant, David Perry, for the sum of $27,398.75. These funds were deposited into an account maintained with the Plaintiff.

According to the Defendants, the transfers they received from A&A Cattle were made as compensation for services performed by the Defendant, David Perry. In particular, the Defendants

Page 2

maintain that David Perry, although unbeknownst to his employer, would use his customer contacts to solicit cattle sales on behalf of A&A Cattle, receiving then a commission check from A&A Cattle for any successful sale. As a part of this service, it was also put forth that David Perry provided "cattle treatment" for A&A Cattle.

The amount of the transfers made by A&A Cattle totaled $49,238.47, and form the basis for the dispute between the Parties. To this end, the Plaintiff called attention to a couple of facts. First, the receipt of the almost $50,000.00 in commissions from A&A Cattle was not originally disclosed by the Defendants in their 2007-year tax return, with the Defendants only amending their return in the latter part of the year 2009 to show the receipt of the commissions. The Plaintiff also pointed out that the commission proceeds the Defendants received from A&A Cattle in 2007 exceed their entire income for the year, with the Defendants' gross income in the year 2007 being $46,781.00.

The Plaintiff's relationship with A&A Cattle began in the year 1994 when the Plaintiff extended a renewable line of credit to A&A Cattle. This line of credit was for the amount of one million dollars and matured annually. Both Robert and Ralph Allen, as the principals of A&A Cattle, personally guaranteed the Plaintiff's extension of credit. For more than a decade, the line of credit was renewed.

On August 14, 2006, the line of credit to A&A Cattle was modified, with A&A Cattle and its principals executing in favor of the Plaintiff a cognovit promissory note in the amount of $800,000.00. Also in 2006, A&A Cattle asked the Plaintiff to extend its line of credit for an additional year. In response, the Plaintiff requested updated financial statements from A&A Cattle, affording short-term extensions of its credit line until such information was submitted. The requested financial information, however, was never provided and, on August 17, 2007, the Plaintiff terminated its line of credit to A&A Cattle. At the time the line of credit was terminated, A&A Cattle

Page 3

had used nearly all of its available credit, with a $799,998.23 balance showing on the account. (Doc. No. 29, Pl. Ex. 2).

Once the line of credit was terminated, A&A Cattle ceased to make any payments on the account. On December 7, 2007, based on the lack of payment, the Plaintiff notified A&A Cattle of its default. On December 31, 2007, the Plaintiff then exercised its rights under the earlier promissory note, obtaining a cognovit judgment against A&A Cattle and its principals in the amount of $867,534.82, plus interest.

Around this same period of time, A&A Cattle ceased operating as an ongoing business concern. Thereafter, both its principals sought bankruptcy relief.[1] Robert Allen was granted a discharge. Ralph Allen, however, had his discharge denied when, after a complaint was brought by the Plaintiff alleging fraud,[2] he voluntarily executed an agreement waiving his discharge. (Doc. No. 29, Pl. Ex. 24).

On December 15, 2008, the Plaintiff filed a suit in state court against the Defendants, alleging that the checks issued to them by A&A Cattle constituted fraudulent transfers. This action was stayed with the commencement of the Debtor's bankruptcy case. On April 13, 2010, the Plaintiff commenced the action now before the Court, seeking to have its claim against the Defendants held to be a nondischargeble debt.

---

[1]

Robert Allen, Chapter 7 case filed on July 2, 2008 (Case No. 08-33459); Ralph Allen, Chapter 7 case filed June 27, 2008 (Case No. 08-33368).

[2]

The Plaintiff brought its complaint pursuant to 11 U.S.C. § 523(a)(2), (4) and (6) and § 727(a)(2), (3), (4), (5) and (7).

Page 4

The Farmers & Merchants State Bank v. David and Cindy Perry
Case No. 10-3096

## DISCUSSION

Before this Court is the Plaintiff's Complaint to Determine Dischargeability of Debt. Proceedings brought to determine the dischargeability of particular debts are deemed to be core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, this Court has the jurisdictional authority to enter final orders and judgments in this matter. 28 U.S.C. § 157(b)(1).

The Plaintiff's Complaint to determine dischargeability is brought pursuant to § 523(a)(2)(A) of the Bankruptcy Code. This provision provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

The purpose of this provision is to except from discharge any debt which arises from a debtor's dishonest conduct, thereby implementing a fundamental bankruptcy policy that only those debts which are honestly incurred may be discharged. *Bartson v. Marroquin (In re Marroquin)*, 441 B.R. 586, 592 (Bankr. N.D.Ohio 2010).

In this matter, the averments giving rise to the Plaintiff's complaint to determine dischargeability under § 523(a)(2)(A) make no reference to any contractual relationship between the Parties. Instead, the Plaintiff only alleged that the Defendants "colluded with A&A in the fraudulent transfers of monies." (Doc. No. 1, at pg. 4). Based on the absence of any direct relationship, the

Page 5

Defendants asserted that, notwithstanding any indicia of fraud on their part, the Plaintiff has no legally cognizable claim against them under § 523(a)(2)(A). In the words of the Defendants:

> the Defendants have had no relationship with Plaintiff whatsoever. A&A is indebted to Plaintiff, not the Defendants. Plus, Plaintiff already has a judgment against A&A. Therefore, Plaintiff has no cause of action against the Defendants because they had nothing to do with the transaction between Plaintiff and A&A.

(Doc. No. 19, at pg. 3). A fair reading of this statement, thus, lends itself to this conclusion: It is the position of the Defendants that, for a debt to be excepted from discharge under § 523(a)(2)(A), a debtor must make a deliberate misrepresentation to a creditor, and that in the absence of any direct representation, no claim under § 523(a)(2)(A) exists.

The position taken by the Defendants does initially find support. In the case of *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, the Sixth Circuit of Appeals, in explaining the conditions necessary to establish a claim under 523(a)(2)(A), put forth the following language:

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material *misrepresentation* that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false *representation*; and (4) its reliance was the proximate cause of loss.

141 F.3d 277, 280-81 (6th Cir. 1998) (emphasis added). In this case, of course, with there being no contractual relationship between the Parties, elements one and three, by requiring a direct representation, would not be satisfied.

Yet, a closer reading of § 523(a)(2)(A) shows why the lack of any affirmative representation does not necessarily shield the Defendants from liability. Section 523(a)(2)(A) provides that any one of three types of conduct can give rise to a nondischargeable debt: (1) false pretenses; (2) a false

Page 6

representation; and (3) actual fraud. In the decision entered in *In re Rembert*, the Sixth Circuit was addressing the second ground, framing the issue before it as this: "thus, we must determine whether Rembert had a subjective fraudulent intent, based on her *representations* to Citibank and AT&T. In so determining, we first must consider the nature of those *representations*." *Id.* at 281 (emphasis added).

Based upon these statements, it is reasonable to assume that, in *In re Rembert*, the Sixth Circuit was not addressing whether the debtor committed "actual fraud" for purposes of § 523(a)(2)(A), but instead was limiting its analysis to whether the debtor made a false representation. This distinction is critical. The scope of "actual fraud" under § 523(a)(2)(A) is broader than a "false representation" and will encompass "any deceit, artifice, trick, or design involving direct and active operation on of the mind, used to circumvent and cheat another." *See, e.g., Kafantaris v. Signore (In re Signore)*, 436 B.R. 71, 80 (Bankr. N.D.Ill. 2010). The case of *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000), as cited by the Plaintiff, is illustrative.

In *McClellan*, the debtor's brother purchased a piece of equipment for $200,000.00, to be paid in installments. The brother subsequently defaulted, still owing the seller more than $100,000.00. The seller then brought suit against the brother.

While the suit was pending, the brother transferred the equipment to the debtor for the sum of $10.00. Although knowing of the suit against her brother, the debtor then sold the equipment for $160,000.00. After the seller added the debtor to the suit against the brother, the debtor filed for bankruptcy relief.

In the debtor's bankruptcy case, the seller commenced an adversary proceeding, alleging its claim against the debtor was a nondischargeable debt pursuant to § 523(a)(2)(A). As in this case, the debtor in *McClellan* argued that the seller's claim did not fall within the scope of § 523(a)(2)(A)

Page 7

because the debtor did not make any direct representation; nor was there any reliance by the seller. The bankruptcy court agreed with this position, but the Seventh Circuit reversed.

In coming to its decision, the Seventh Circuit in *McClellan* pointed out that most cases "assume that fraud equals misrepresentation[.]" *Id.* at 892. Similarly, the Seventh Circuit pointed out that "[m]ost frauds do involve misrepresentation[.]" *Id.* at 893. However, the Seventh Circuit in *McClellan* also said that, "[n]o learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions." *Id.* The Court then further explained:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*Id.* (internal citation omitted).

The Court in *McClellan* termed the type of a defense raised by the debtor a "two-step routine" "in which Debtor A transfers valuable property to B for nothing in order to keep it out of the hands of A's creditor and B then sells the property and declares bankruptcy in an effort to shield herself from liability for having colluded with A to defeat the rights of A's creditor." *Id.* According to the Court in *McClellan*, such a maneuver "is as blatant an abuse of the Bankruptcy Code as we can imagine. It turns bankruptcy into an engine for fraud." *Id.*

This holding of the Seventh Circuit, that a cause of action under § 523(a)(2)(A) is not limited to misrepresentations, was later followed by the Bankruptcy Appellate Panel for the Sixth Circuit in *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. B.A.P. 2001). In

Page 8

doing so, the court in *In re Vitanovich* held that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *Id.*

Except in the rare instance where it would produce an absurd result, the Bankruptcy Code is to be read according to its plain meaning. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 238-240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Interpreting § 523(a)(2)(A) so as to apply to a debtor who did not make any direct representation to a plaintiff does nothing to offend this interpretative principle because, as already stated, the statute provides that it applies not only to a "false representation" but also to "actual fraud." Nor does such a reading contradict the purpose of § 523(a)(2)(A) which, as also stated earlier, seeks to ensure that a discharge is only extended to debts which are incurred honestly.

For these reasons, there is no basis to deviate from the precedent set down in *McClellan* and *In re Vitanovich*. Therefore, the Court must reject the Defendants' position, and instead hold that when "actual fraud" is alleged, a misrepresentation is not a prerequisite to a finding of nondischargeability under § 523(a)(2)(A). Moreover, as pointed out in *McClellan*, where a misrepresentation is not at issue, a creditor's reliance is no longer at issue since there was no representation upon which the creditor could have relied. 217 F.3d at 894. ("reliance is relevant only when a fraud takes the form of a misrepresentation."). Having, thus, decided the legal issue presented, the Court now turns to address whether the Defendants' actions constituted "actual fraud" against the Plaintiff.

As previously set forth, "actual fraud" encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." This assessment, as with any action under § 523(a)(2)(A), is made by looking to a debtor's subjective intent. *In re Rembert*, 141 F.3d at 281 (6th Cir. 1998) ("Whether a debtor possessed an intent to

Page 9

defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard."). The burden to show that a debtor acted with the requisite intent to defraud is placed on the creditor who must establish its case by at least a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

For a creditor to meet their burden in a situation such as this, where a third party, but not the debtor, is alleged to have made the misrepresentation, the trier-of-fact must be first persuaded that the third party, here A&A Cattle, committed fraud. Once this is established, it must be shown that the debtor colluded with the fraudulent conducted perpetrated by the third party. As put forth in *McClellan*, the debtor must have been a "full and equal participant" in the fraud, in effect being an "accomplice." 217 F.3d 894-95 (7th Cir. 2000). This assessment, as with any case involving fraud, is made by looking at the totality of the circumstances, including inferences from circumstantial evidence. *In re Rembert*, 141 F.3d at 282.

In this matter, the evidence shows that, in the time period immediately preceding the Plaintiff's termination of its account with A&A Cattle, the business fully used its line of credit with the Plaintiff, and also failed to abide by Plaintiff's request to provide financial information. Notwithstanding, A&A Cattle used the line of credit to make significant transfers to the Defendants, all the while making no payments to the Plaintiff. Particularly fraudulent in character, many of the transfers made to the Defendants occurred after August 17, 2007, when A&A Cattle's line of credit had been terminated. Even more damaging, some of the transfers to the Defendants were even effectuated after the Plaintiff formerly notified A&A Cattle of its default on December 7, 2007.

Two final considerations are also indicative of fraud. First, the principals of A&A Cattle are close relatives of the Defendants, thereby making their transactions more suspect. *See* 11 U.S.C. § 101(31)(A)(i) (defining insider); § 548 (fraudulent transfers). *See also Williams v. Courtney (In re Courtney)*, 351 B.R. 491, 508 (Bankr. E.D.Tenn. 2006) (listing badges of fraud to include a

Page 10

relative). Second, the evidence in this case also revealed that Ralph Allen, a principal of A&A Cattle, agreed to waive his bankruptcy discharge based upon a complaint brought by the Plaintiff wherein allegations of fraud were made.

For the Court, the total weight of these considerations is sufficiently persuasive to establish that A&A Cattle, and at least one of its principals, committed fraud against the Plaintiff. As such, the question becomes whether the Defendants fully participated in the fraud. For this question, many considerations point to the Defendants having knowingly participated in the fraud perpetrated by their relatives through A&A Cattle.

First, as with A&A Cattle, the Defendants' dealings with the business are subject to more scrutiny given the Defendants' familial relationship with A&A Cattle.[3] Yet, the familial relationship between A&A Cattle and the Defendants only scratches the surface. To begin with, the transfers made between the Defendants and A&A Cattle do not conform to standard business practices, with the evidence showing: (1) checks were written by A&A Cattle to both of the Defendants, despite the fact that the checks were ostensibly drafted as compensation for only the services of the Defendant, David Perry; and (2) many of the checks drafted were issued out of numerical order and for the same amount.

To be sure, some reasonable explanations do exist for these irregularities. Poor record keeping comes first to mind, with it being common for closely-held businesses, such as A&A Cattle, to forego proper accounting procedures. The Defendant, Cindy Perry, also explained that some

---

[3] This is not to say that transactions conducted between family are assumed to be fraudulent. To the contrary, the vast majority of transactions between family members can be assumed to be conducted for perfectly legitimate reasons. As such, transactions between two related individuals cannot, alone, sustain a finding of fraud.

Page 11

checks were issued to her, despite her husband being the real party entitled to the proceeds, on account of convenience, with her husband often being out of town, and thus unable to physically pick up the commission checks.

However, such irregularities must be viewed in light of two further considerations: the timing and the size of the transactions between the Parties. In less than a half of year, 26 checks were written to the Defendants totaling almost $50,000.00, an amount which noticeably exceeded the Defendants' yearly salary. Under these circumstances, with irregular financial transactions taking place for large sums of money, it is hard to fathom that the Defendants were completely ignorant of the fraud perpetrated by A&A Cattle. At the very least, these facts show that the Defendants were turning a blind eye to A&A Cattle's fraud. In this regard, this Court has recognized that "willful blindness"[4] does not provide a defense to an action brought under § 523(a)(2)(A), and may instead be used as a factor indicative of fraud. *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 164 (Bankr.N.D.Ohio 2003), *citing United States v. Stewart*, 185 F.3d 112, 126 (3rd Cir.1999) (fraud may be inferred from willful blindness).

But tipping the balance in favor of a finding of "actual fraud" by the Defendants is the manner in which the Defendants handled the 26 commission checks received from A&A Cattle. First, despite clearly constituting taxable income, the Defendants did not initially disclose the commissions checks on their tax return. Second, the Defendant, David Perry, made it known that he did not disclose to his employer, Great Lakes Cattle Marketing, his business transactions with A&A Cattle, with Mr. Perry acknowledging that his employer would probably not have approved of the arrangement.

---

[4]

Willful blindness is a form of constructive knowledge that allows one to impute the element of knowledge to a defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *U.S. v. Schnabel*, 939 F.2d 197, 203 (4th Cir.1991).

Page 12

With this, the weight of the evidence clearly shows that the Defendants engaged in a scheme to hide Mr. Perry's commission checks from the IRS and Mr. Perry's employer. Moreover, when their course of conduct is viewed in conjuncture with those other matters discussed, it becomes but a short step to conclude that the Plaintiff has sustained its burden of showing that the Defendants actively participating in the fraud perpetrated by A&A Cattle.

In rebuttal, the Defendants pointed out that they did later amend their tax return to reflect the income received from the commission checks; they also explained that their initial failure to disclose the commissions on their tax return occurred because they did not believe that commissions constituted taxable income. The Court, however, finds such explanations to be weak as the Defendants only amended their return when it had become apparent that negative consequences could follow from their failure to disclose the commission checks. It also seems disingenuous that the Defendants, after receiving commissions totaling more than their annual income, would not think to at least inquire about the taxable status of the commissions.

The Defendants also contend that no fraud on their part can exist because the Defendant, David Perry, actually provided consideration for the commission checks – namely by brokering deals for A&A Cattle and by providing cattle treatments. The Court, however, has significant concerns with this position, with the greater weight of the evidence showing that much of the compensation paid by A&A Cattle to David Perry was for services for which he had already been compensated by his employer, Great Lakes Cattle Marketing. This is particularly true considering that Mr. Perry's own testimony tends to show that a scheme involving the commission checks existed.

In particular, upon cross examination, the Defendant, Mr. Perry, made statements contradicting the Defendants' position that no scheme involving the commission checks existed. First, when pressed to explain, Mr. Perry substantively acknowledged that he did intend to hide his commission income from both the IRS and his employer, Great Lakes Cattle Marketing. This

Page 13

concealment was also taken after consultation with the A&A Cattle, with Mr. Perry testifying that at least one of the principals of A&A Cattle told him not to claim the commission checks on his taxes. Consequently, whatever services allegedly performed by Mr. Perry, the overall character of the Defendants' conduct remains the same: They actively colluded with A&A Cattle to defraud the Plaintiff.

As a final point in their defense, the Defendants pointed out that they deposited the commission checks received from A&A Cattle into an account maintained with the Plaintiff. Ergo, if they had intended to defraud the Plaintiff, why would they have given the Plaintiff any potential control and/or access to the defrauded funds? The Court, however, cannot give this argument much credence as the account seems to have been used simply for convenience and there is no evidence that the funds stayed in the account for any great length of time.

In summation, the Court finds that when the issue of "actual fraud" is raised for purposes of § 523(a)(2)(A), a plaintiff need not show the existence of any misrepresentation. In addition, on the matter of "actual fraud," the Court finds that the Plaintiff has sustained its evidentiary burden for purposes of § 523(a)(2)(A). In reaching the conclusions found herein, the Court has considered all the evidence, exhibits and arguments of counsel, regardless of whether they are specifically referred to in this Opinion.

Page 14

The Farmers & Merchants State Bank v. David and Cindy Perry
Case No. 10-3096

Accordingly, it is

**ORDERED** that, for purposes of 11 U.S.C. § 523(a)(2)(A), any claim, as the term is defined in 11 U.S.C. § 101, be, and is hereby determined to be a NONDISCHARGEABLE DEBT.

Dated: March 17, 2011

Richard L. Speer
United States
Bankruptcy Judge

Page 15

# CERTIFICATE OF SERVICE

Copies were mailed this 17th day of March, 2011 to:

The Farmers & Merchants State Bank
307-11 N. Defiance St
P.O. Box 216
Archbold, OH 43502

James L Rogers
PO Box 10032
1 Seagate, 24th Fl
Toledo, OH 43699

Tiffany E. Cavanaugh
One SeaGate, 24th Fl
PO Box 10032
Toledo, OH 43604

David P. Perry
506 Maplewood St
Delta, OH 43515-1216

Cindy A. Perry
506 Maplewood St
Delta, OH 43515-1216

Elliot H Feit
420 Madison Ave
1010 Ohio Bldg
Toledo, OH 43604

Jeffrey D Levy
520 Madison Ave, #840
Toledo, OH 43604


_____/s/Diana Hernandez_____
Deputy Clerk, U.S. Bankruptcy Court